**UNITED STATES COURT OF INTERNATIONAL TRADE**

TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD. and M.L.T. SOLAR ENERGY PRODUCT CO., LTD.

Plaintiffs,

v.

UNITED STATES,

Defendant.

Court No. 25-00166

**PUBLIC VERSION**
Business proprietary information has been removed on pages 4 –7, 9, and 11–14.

## COMPLAINT

Pursuant to Rule 3(a)(2) of the Rules of the United States Court of International Trade, Plaintiffs, Trina Solar Science & Technology (Thailand) Ltd. ("TTL") and M.L.T. Solar Energy Product Co., Ltd. ("MLT"), by and through its counsel, allege and state as follows:

## JURISDICTION

1. Plaintiffs bring this action pursuant to, and in accordance with, section 516A(a)(2)(A)(i)(II) of the Tariff Act of 1930, as amended (codified at 19 U.S.C. § 1516a(a)(2)(A)(i)(II), contesting the final determination issued by the U.S. Department of Commerce ("Commerce") in Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Thailand: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Affirmative Determination of Critical Circumstances, 90 Fed. Reg. 17,395 (Dep't Commerce Apr. 25, 2025) ("Final Determination"), and accompanying Issues and Decision Memorandum (Apr. 18, 2025) ("IDM"); see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 90 Fed. Reg. 26,786 (Dep't Commerce June 24, 2025).

This Court has jurisdiction over this matter under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2).

## STANDING

2. Plaintiffs, Trina Solar Science & Technology (Thailand) Ltd. and M.L.T. Solar Energy Product Co., Ltd., are foreign producers and exporters of the merchandise examined in the antidumping proceeding that is contested here. Plaintiffs therefore are interested parties within the meaning of 19 U.S.C. § 1677(9)(A). As interested parties that actively participated in the underlying administrative proceeding, Plaintiffs have standing pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS

3. The Final Determination, which is being challenged herein, was published in the Federal Register on April 25, 2025. See 90 Fed. Reg. 17,395. Following an affirmative injury determination by the U.S. International Trade Commission, Commerce published an antidumping duty order in the Federal Register on June 24, 2025. See 90 Fed. Reg. 26,786. On July 24, 2025 – within 30 days after the order was published in the Federal Register, Plaintiffs filed a summons to initiate this action. See ECF No. 1. Accordingly, this action was commenced within the period specified in 19 U.S.C. § 1516a(a)(2)(A)(ii). This Complaint is being filed within 30 days of the filing of the summons. Therefore, according to the provisions of 19 U.S.C. § 1516a(a)(2)(A) and Rule 3(a)(2) of the Rules of the U.S. Court of International Trade, this action has been timely brought.

## STANDARD OF REVIEW

4. This Court reviews final determinations issued by Commerce pursuant to 19 U.S.C. § 1677j to determine whether they are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## PROCEDURAL HISTORY

5. On May 20, 2024, Commerce initiated an antidumping duty investigation against subject merchandise from Thailand based on the April 24, 2024, petition filed by the American Alliance for Solar Manufacturing Trade Committee ("petitioner"). See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules From Cambodia, Malaysia, Thailand, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations, 89 Fed. Reg. 43,809 (May 20, 2024). Commerce's period of investigation ("POI") was April 1, 2023, through March 31, 2024.

6. On June 21, 2024, Commerce released its respondent selection memorandum stating that it had selected TTL as the sole mandatory respondent. Although not selected as a mandatory respondent, MLT filed an entry of appearance and participated in the investigation as an interested foreign producer and exporter of subject crystalline silicon photovoltaic ("CSPV") products.

7. Between July 2024 through August 2024, TTL submitted timely responses to Commerce's initial antidumping duty questionnaires.

8. On September 19, 2024, the petitioner filed an allegation that a Cost-Based Particular Market Situation ("PMS") existed in Thailand as a result of non-market economy inputs purchased by TTL. See Letter from Wiley Rein, "Allegations of a Cost-Based Particular Market Situation Affecting Thailand," (Sept. 19, 2024) ("PMS Allegation"). Specifically, the petitioner alleged that TTL's cost of production ("COP") is distorted due to China's dominance in the Thai market for supplying CSPV inputs, and China's status as a non-market economy ("NME"). Id., at 10. The petitioner alleged that "dramatic differences in the prices" exist

between Chinese and non-Chinese inputs. Id., at 11. Further, the petitioner asserted that "the non-China polysilicon price is roughly three times that of Chinese-produced polysilicon." Id., at 13. The petitioner requested that Commerce instead use surrogate values to calculate normal value for TTL's inputs. Id., at 15. The petitioner proposed various sources of import statistics for Commerce to use as surrogate values for valuing allegedly distortive solar inputs.

9. On October 18, 2024, TTL submitted rebuttal comments to the petitioner's PMS allegation. See Letter from Trade Pacific PLLC, "Response to PMS Allegation," (Oct. 18, 2024). TTL's comments established that none of its polysilicon is sourced from China, thereby rendering petitioner's China-centric allegations irrelevant. Id., at 8. As a benchmark for wafer prices, TTL submitted Bloomberg New Energy Finance (BNEF) data, showing spot prices for the POI for monocrystalline silicon wafers were [ ] USD/kg, whereas TTL's purchase prices of wafers were [ ] USD/kg. Id., at 10, Exhibit WAFER-3B. Thus, TTL's purchase prices of wafers were already more than [ ] the global benchmark due to TTL's reliance on [ ]. Id. TTL also submitted information demonstrating that HTS code 3818.00, used as a "global benchmark" for valuing solar wafers, is a broad classification category covering "Chemical elements; doped for use in electronics, in the form of discs, wafers, or similar forms; chemical compounds doped for use in electronics." Id., at 25. This category covers imports of pastes, resin, silicon gel, adhesives, UV coatings, and other miscellaneous silicon products, wholly unrelated to solar wafers. Id., at Exhibit BMARK-1A and BMARK-1B.

10. On November 12, 2024, TTL submitted its response to Commerce's Supplemental Section D questionnaire. See Response from Trade Pacific PLLC, "Section D Supplemental Questionnaire Response, "(Nov. 12, 2024) ("TTL Supp D Resp."). In Exhibit SD-

4e.2, TTL reported the cost of production ("COP") for all its purchases of wafer, which established that the transfer purchase price was well above the COP. TTL also submitted cost information demonstrating that [ ] percent of its solar glass came from non-China and non-Thai sources. See id., at Exhibit SD-4e. In addition, TTL submitted information establishing that Thailand has significant domestic production of solar glass. Id., at Appendix 2.4, Appendix 4. It further submitted import statistics from Trade Data Monitor ("TDM") covering imports specific to solar glass. Id., at Appendix 5.

11. On December 4, 2024, Commerce published its Preliminary Determination in the Federal Register. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From Thailand: Preliminary Affirmative Determination of Sales at Less-Than-Fair-Value, Affirmative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures, 89 Fed. Reg. 96,214 (Dec. 4, 2024) ("Preliminary Determination"); see also accompanying Issues and Decision Memorandum (Nov. 27, 2024) ("PDM"). Commerce calculated a preliminary weighted-average dumping margin of 77.85 percent for TTL and MLT. In its Preliminary Determination, Commerce stated that it would address petitioner's PMS allegation in a post-preliminary analysis memorandum. PDM, at 23.

12. As a part of its Preliminary Determination, Commerce adjusted TTL's reported total cost of manufacture by [ ] percent pursuant to 19 U.S.C. § 1677b(f)(3), i.e., the "Major Input Rule." See Commerce Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination—Trina Solar Science & Technology (Thailand) Ltd." (Nov. 27, 2024) ("Prelim. Cost Memo"), at 2. Commerce analyzed TTL's wafer purchases from affiliated NME producers and compared them to surrogate market values

and to surrogate COP, where there was an "absence of the affiliates' COP." Id. Commerce derived the surrogate COP amount by using AUV import data from TDM, covering Malaysia, Turkey, Mexico, and Indonesia. See id., at Attachment 1A. As a surrogate market price, Commerce used Thai import statistics under HTS code 3818.00, submitted by the petitioner in its PMS allegation, amounting to $400.77/kg. See id., at Attachment 1B. TTL's average purchase price was [ ]. Id., at Attachment 1A. In every comparison, Commerce selected the surrogate market price of $400.77/kg based on Thai import statistics under HTS code 3818.00, which resulted in an average markup of 352% over TTL's reported purchase price for wafers. Id.

13. In the Preliminary Determination, Commerce also made a cost adjustment to aluminum frames, EVA, solar glass, and junction boxes pursuant to the "Transactions Disregarded Rule" under 19 U.S.C. § 1677b(f)(2). See Prelim Cost Memo, at 2–3. Commerce compared the POI transfer price for these inputs to the weighted-average market prices and increased the input cost by [ ] percent. Id., at Attachment 1A.

14. On December 9, 2024, TTL submitted surrebuttal factual information to petitioner's rebuttal factual information filed in response to TTL's Supplemental Section D questionnaire response. See Letter from Trade Pacific PLLC, "Rebuttal to Petitioner's RFI on TTL's Supplemental D Response," (Dec. 9, 2024) ("TTL Dec. 9 RFI"). TTL placed on the record data confirming that all its polysilicon was sourced from [ ], and not from China. Id., at Exhibit POLY-3.

15. From December 16 through December 20, 2024, Commerce conducted an on-site cost verification at TTL's facility in Rayong, Thailand.

16. On January 22, 2025, Commerce requested that interested parties provide POI

data for (1) non-Chinese wafer and glass prices and (2) global wafer and glass prices. See Letter from Commerce to All Interested Parties, "Opportunity for Interested Parties to Provide Pricing Information with Regard to Wafers and Solar Glass," (Jan. 22, 2025).

17. On February 5, 2025, TTL submitted factual information in response to Commerce's request. See Letter from Trade Pacific PLLC, "Pricing Information with Regard to Wafers and Solar Glass," (Feb. 5, 2025) ("TTL Feb. 5 Info."). TTL submitted contemporaneous TrendForce data as a non-Chinese wafer benchmark. Id., at Exhibit 2. The TrendForce data included monthly historical solar wafer spot prices for overseas non-China markets, excluding all wafer sources from China. Id. This data was particular to large format wafers, the same exact size used in TTL's solar wafer inputs. Id. In addition, TTL submitted contemporaneous, product-specific wafer prices sourced from Clean Energy Associates ("CEA"). See id., at Exhibit 3A. This data was specific to Southeast Asia, which excluded prices from China. Id. The average non-China solar wafer prices from multiple public sources ranged from [ ] USD per kilogram, whereas Chinese-sourced wafer POI prices ranged from [ ] USD per kilogram. See id., at 2. In addition, TTL submitted Import Genius import statistics from Turkey, identified as economically comparable to China by Commerce, covering imports specific to 2-3.2mm solar glass. Id., at Exhibit 10A.

18. From February 12 through February 15, 2025, Commerce conducted an on-site constructed export sales ("CEP") verification of TTL's affiliate Trina Solar (U.S.) Inc. at its offices in Fremont, California. On February 26, 2025, Commerce released its CEP sales verification report as to TTL's U.S. affiliate. Subsequently, on March 6, 2025, Commerce released its cost verification report as to TTL. See Commerce Memorandum, "Verification of the Cost Response of Trina Solar Science & Technology (Thailand) Ltd." (Mar. 6, 2025). As a

part of its cost verification report, Commerce verified TTL's affiliated wafer purchases and noted that prices TTL paid to affiliates were "comparable" to those its affiliates paid to unaffiliated parties. Id., at Exhibit CVE-9.

19. On March 17, 2025, TTL submitted its affirmative case brief in response to issues raised in Commerce's Preliminary Determination. See Brief from Trade Pacific PLLC, "Case Brief of Trina Solar Science & Technology (Thailand) Ltd." (Mar. 17, 2025). TTL argued that the COP information for all its affiliated wafer purchases was on the record. Id., at 16. TTL further argued that even if Commerce were to wrongly disregard the reported COP for its affiliated wafer purchases, Commerce's valuation of wafer prices using Thai import statistics under HTS 3818.00 was severely flawed. Id., at 29–39. Finally, TTL argued that Commerce should make an adjustment to the margin to account for wafer subsidies countervailed. Id., at 40–41. Because Commerce calculated normal value based on constructed value, the imposition of both a less-than-adequate-remuneration ("LRAR") adjustment and an adjustment under the major input rule, resulted in a double remedy.

20. On March 24, 2025, six months after the allegation was filed, Commerce released its post-preliminary analysis addressing petitioner's PMS allegations. See Commerce Memorandum, "Less-Than-Fair-Value Investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from Thailand: Post-Preliminary Analysis of the Particular Market Situation," (Mar. 24, 2025). In regard to aluminum frames, EVA, and junction boxes, Commerce determined that such minor inputs' share of the total COM was not significant enough to warrant a PMS adjustment. Id., at 1. However, pursuant to19 C.F.R. § 351.416(d), Commerce found that a PMS exists for China-sourced wafers and solar glass. Id., at 16. For wafer, Commerce selected petitioner's global export price data for HTS code 3818.00. Id., at 18;

see also Letter from Wiley Rein, "Wafer and Solar Glass Pricing Information," (Feb. 5, 2025), at Exhibit 1. For solar glass, Commerce also selected Eurostat import data submitted by petitioner under HTS code 7007.19.80. Id., at 19. Commerce compared these global benchmarks to the transfer price of wafers and solar glass from TTL's wafer suppliers. Id., at 20. In finding the wafer and solar glass transfer prices to be lower, Commerce concluded that a cost-based PMS does exist. Id. Commerce further concluded that China's dominance of the solar input market in Thailand, and its status as an NME, are more likely than not to have contributed to the identified distortion. Id. Consequently, Commerce made additional adjustments to TTL's reported wafer and solar glass input costs. While Commerce had already increased TTL's wafer cost by 165.36% to $400.77/kg in the Preliminary Determination, Commerce further increased the total cost of manufacturing ("TOTCOM") by [ ] percent after comparing the difference in the Major Input Rule price to the global PMS wafer benchmark price. Id., at Attachment. For solar glass, Commerce made an additional adjustment by comparing the transactions disregard price of [ ] to the global PMS glass benchmark price of [ ], which resulted in a [ ] percent upward price adjustment. Id.

21. The next day, on March 25, 2025, Commerce established a briefing schedule for case and rebuttal briefs in response to its PMS determination. Interested parties were given one week to submit arguments on Commerce's PMS analysis and decision.

22. On March 31, 2025, TTL submitted its PMS case brief. Concerning Commerce's PMS benchmark selection for wafer, TTL noted that of the thirteen sources of benchmark data submitted to Commerce—seven of which were specific to solar wafer, and four of which were generally reflective of solar wafers—Commerce relied solely on the two broad trade data sources, not specific to solar wafers, with per-unit prices that were five to ten times greater than

the prices specific to solar wafers. See id., at 12. Similarly, when selecting benchmarks for solar glass, Commerce selected an over-inclusive HTS code, unspecific to solar glass, with unit prices that were four to five times higher than solar glass prices, despite other sources available on the record which were product-specific, contemporaneous, and exclusive of data from China and Thailand. Id., at 23.

23. On April 25, 2025, Commerce published its Final Determination in the Federal Register. 90 Fed. Reg. 17,395. In its final determination, Commerce continued to apply a 165% upward adjustment to TTL's wafer purchases based on the Major Input Rule, using Thai import statistics under HTS code 3818.00. See IDM, at Cmt. 7. Further, Commerce did not amend any aspect of its PMS analysis, and it continued to find that a PMS existed in Thailand as to wafer and glass prices. Id., at Cmt. 8. Commerce also did not amend any aspect of its adjustments to TTL's wafer and solar glass purchases, and it continued to rely on broad, non-product specific benchmarks submitted by the petitioner. Id.; see also Commerce Memorandum, "Cost of Production and Constructed Value Calculation for the Final Determination—Trina Solar Science & Technology (Thailand) Ltd." (Apr. 18. 2025) ("Final Cost Memo"). As a result of Commerce's PMS and Major Input Rule adjustments, the final weighted-average dumping margin and ongoing cash deposit rate for TTL and MLT was set at 111.45 percent.

## ISSUES PRESENTED BY THE ACTION AND PLAINTIFFS' STATEMENT OF CLAIMS

24. In the following respects, and for other reasons apparent from the record of the administrative proceeding, Commerce's final determination in its antidumping duty investigation is unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT ONE

25. Paragraphs one through twenty-four are incorporated herein by reference.

26. Commerce's adjustment of TTL's wafer cost under the Major Input Rule was not in accordance with substantial evidence. See 19 U.S.C. § 1677b(f)(3). TTL submitted COP information for all its affiliates from which it purchased solar wafer. See TTL Supp D Resp., at Exhibit SD-4e.2. Accordingly, COP information from affiliates was available and reflected above-cost transfer prices. Id. Even if TTL's affiliated COP information was disregarded, Commerce's selection of a benchmark market price for the valuation of its wafer purchase price resulted in an egregious markup of 352% in wafer prices, adjusting TTL's wafer purchase price from an average of [ ] to $400.77/kg. Of the total [ ] percent TOTCOM adjustment made by Commerce to TTL's reported costs, 165.36 percent is attributable to Commerce's adjustment for wafers under the Major Input Rule. See Final Calc. Memo, at Attach 2. Commerce relied on over-inclusive Thai import statistics under HTS code 3818.00, a classification category for which Commerce had acknowledged "may include products in addition to wafers," but should be relied upon regardless because at least the code "includes the input at issue." PMS Decision Memo, at 18; see also IDM, at 50. Commerce's adjustment was undoubtedly unreasonable and cannot be supported by substantial evidence.

**COUNT TWO**

27. Paragraphs one through twenty-six are incorporated herein by reference.

28. Commerce's finding of a PMS affecting the price of solar wafers in Thailand was unsupported by substantial evidence. Under 19 C.F.R. § 351.416(d), Commerce must find that a circumstance or set of circumstances existed that may have impacted costs of producing inputs into the production of subject merchandise. Commerce must also find that the prices of the input "were not in accordance with market principles or were distorted, and therefore did not accurately reflect the cost of production of subject merchandise in the ordinary course of trade."

While the petitioner alleged that Chinese polysilicon capacity and production have roughly tripled, resulting in China's market dominance for wafers in Thailand, see PMS allegation at 6–7, record evidence establishes that TTL did not source any of its polysilicon from China. See TTL Dec. 9 RFI, at Exhibit POLY-3. In finding that a PMS exists for the entire market of Thailand, Commerce unreasonably disregarded record evidence establishing that the sole mandatory respondent does not source its polysilicon from China. Further, the record reflected that TTL's purchase prices of wafers were significantly higher at [ ] percent higher than the average import price of wafer from China to Thailand, at 51.7/kg. See TTL Supp D Resp., at Exhibit SD-4.1. TTL's wafer purchase prices therefore accurately reflected the cost of production in the "ordinary course of trade" because its supply chain reflected higher priced non-Chinese polysilicon.

29. Commerce's finding of a PMS in Thailand for wafer prices was further unsupported by substantial evidence because the record establishes that non-China prices of wafer are substantially higher than China prices. Therefore, China's "dominance" of global wafer prices is not creating any distortive effect on wafer market prices, otherwise global prices would be aligned lower to China wafer prices. Nothing on the record supports that China is setting the global price for wafers. The fact that non-China wafer prices are significantly higher than Chinese import prices proves that the Thai market is not distorted, where pricing can be independently set and market based. Thus, Commerce's finding of a PMS based on an alleged price distortion from China is not supported by substantial evidence.

**COUNT THREE**

30. Paragraphs one through twenty-nine are incorporated herein by reference.

31. Even if Commerce's determination of a PMS as to solar wafer is sustained,

Commerce's benchmark selection for valuing solar wafer was unsupported by substantial evidence and reflected highly aberrational pricing data. Similar to its benchmark for the Major Input Rule, Commerce relied on over-inclusive global export data covering HTS code 3818.00. Commerce acknowledged that this classification "may include products in addition to wafers" but should be relied upon regardless because the code "includes the input at issue. (i.e., wafers)." PMS Decision Memo, at 18; see also IDM, at 50. Following Commerce's reasoning, any benchmark is acceptable as long as some of the product is reflected within the data. Commerce unreasonably chose to elevate the factor of "contemporaneity" over product-specific accuracy in valuing wafers used in the production of solar modules. IDM, at 50. In selecting over-inclusive export data, covering a range of highly dissimilar products, Commerce ignored seven other sources on the record that reflected contemporaneous, solar-specific wafer prices exclusive of Chinese and Thai data. See TTL Feb. 5 Info., at Exhibits 2A, 3A, 3C. In choosing to disregard such product-specific value information, Commerce misstated facts of the record, asserting that sources include Chinese data, when the record established otherwise. Id. In sum, Commerce's selection of a highly aberrational wafer benchmark based on over-inclusive export data was unsupported by substantial evidence.

**COUNT FOUR**

32. Paragraphs one through thirty-one are incorporated herein by reference.

33. Commerce's finding that a PMS existed in Thailand for solar glass inputs was unsupported by substantial evidence. The record shows that TTL sourced [ ] percent of its solar glass from non-China sources. See TTL Supp D, at Exhibit SD-4e. As the sole selected mandatory respondent, Commerce cannot reasonably disregard TTL's own sourcing and purchase prices in favor of larger, unsubstantiated market allegations. While Commerce asserts

that the prices TTL paid for "solar glass in Thailand reflect the larger market conditions in Thailand," it entirely ignored the fact that TTL primarily sourced from non-China and non-Thai sources. See IDM, at 39. Accordingly, Commerce's finding of a PMS in Thailand is logically inconsistent and unsupported by substantial evidence.

**COUNT FIVE**

34. Paragraphs one through thirty-three are incorporated herein by reference.

35. Commerce's selection of a PMS benchmark for solar glass was unsupported by substantial evidence. Commerce selection of an un-specific overly broad HTS code, inclusive of other glass products and types, resulted in a highly distortive solar glass value. Of the total [ ] percent TOTCOM adjustment made by Commerce to TTL's reported costs, [ ] percent is attributable to Commerce's solar glass benchmark. See Final Calc. Memo, at Attach 2. Commerce's rationale for disregarding other sources was unreasonable where such other sources also reflected broad-based average prices, exclusive of data from China and Thailand, but were product specific. See e.g., TTL Feb. 5 Info., at Exhibits 2A, 3A, and 3C. By attempting to remove distortions allegedly caused by Chinese prices, Commerce instead introduced gross distortions into its calculation of the AD margin. Accordingly, Commerce's benchmark selection is unsupported by substantial evidence.

**COUNT SIX**

36. Paragraphs one through thirty-five are incorporated herein by reference.

37. Commerce's failure to adjust TTL's AD margin to account for subsidies countervailed is unsupported by substantial evidence. Using constructed value, Commerce imposed a double remedy by applying both an LTAR adjustment and an adjustment under the major input rule to TTL's purchase prices. Commerce's failure to account for this apparent

double remedy is therefore unsupported by substantial evidence.

**DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF**

38. For the reasons stated above, Plaintiffs respectfully request that the Court:

(a) enter judgment in Plaintiffs' favor;

(b) declare that with respect to the issues raised in this Complaint, Commerce's determination and all related findings and conclusions are unsupported by substantial evidence on the record or are otherwise not in accordance with law;

(c) remand these matters to Commerce for redetermination consistent with the Court's opinion; and

(d) provide such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Jonathan M. Freed

Jonathan M. Freed
MacKensie R. Sugama

**TRADE PACIFIC PLLC**
700 Pennsylvania Avenue, SE, Suite 500
Washington, DC 20003
Tel: (202) 223-3760
jfreed@tradepacificlaw.com

Counsel for Plaintiffs *Trina Solar Science & Technology (Thailand) Ltd. and M.L.T. Solar Energy Product Co., Ltd.*

Dated: August 25, 2025